JOURNAL ENTRY AND OPINION
Appellant Sherlie Willis appeals from the decision of the Cuyahoga County Court of Common Pleas, Juvenile Division, to award permanent custody of her six children to the appellee, Cuyahoga County Department of Children and Family Services (CCDCFS).[1]
The trial court record reveals that on May 25, 1997, the appellant's three-year-old son died from unknown causes while in her custody. On May 27, 1997, the appellant's six living children were placed in the emergency custody of CCDCFS. A case plan for the children was filed with the court on July 28, 1997. This case plan was signed by the appellant on June 20, 1997. There are four problems listed and four objectives listed in the body of the case plan which pertain to the appellant. The appellant was found to have the following problems: 1) lack of parenting skills; 2) death of a child and possible psychological problems; 3) family refused to allow completion of the investigation; and, 4) poor housing. To resolve these problems the following were listed as objectives: 1) improvement of the appellant's parenting skills; 2) the appellant must undergo a psychological evaluation and undergo counseling for current issues; 3) the home must be investigated either voluntarily or with a search warrant; and, 4) safe housing must be provided for the children. The children were placed in foster homes and the case plan indicates that they should all receive counseling over the death of their brother.
On August 1, 1997, a complaint was filed by CCDCFS requesting temporary custody of all six children. The complaint alleges that the children were neglected because the home was "in a deplorable condition, e.g., no beds for the children, no furniture, exposed electrical wires, water damage, roach infested and trash strewn throughout the home." (Complaint at paragraph 3). The complaint further states that the appellant has a history with CCDCFS since 1985 for past neglect of her children; that the children have had excessive absences and tardiness from school; and that the appellant lacks the appropriate parenting skills to provide care for the children. At a hearing before the trial court held on September 18, 1997,[2] the appellant admitted to the complaint, as amended[3] and the court committed the children to the temporary custody of CCDCFS.
A motion to modify the temporary custody to permanent custody was filed by CCDCFS on April 28, 1998. On February 24, 1999, the trial court journalized an entry withdrawing the motion for permanent custody. The court continued the placement of the children in the temporary custody of CCDCFS. This entry states that the case plan filed was approved and journalized.[4] CCDCFS again filed a motion for permanent custody on May 21, 1999. The affidavit of the social worker attached to the motion indicates that the appellant failed to remedy the conditions causing removal; that the appellant has participated, but not benefitted from services; that the psychological assessment was not complete; that the appellant's counselor does not think she has the capacity to parent all of the children at once; that the appellant has limitations and the children have behavior problems which make them difficult to parent and supervise; and, that the appellant does not have the resources to obtain and maintain housing for the children.
On January 5, 2000, CCDCFS filed an amendment to the case plan extending services to the appellant until 5/12/2000 and deleting two of the objectives regarding the appellant. The two objectives deleted were number two and number four. This presumably references the original case plan where objective two was for the appellant to undergo a psychological evaluation and receive counseling, and objective four was to obtain safe housing.
A six-month review was conducted on February 11, 2000. Attached to this review is a case plan time-stamped April 26, 1999. This case plan indicates that the appellant completed her parenting classes, but the issue was raised as to whether there had been any benefit received from the classes. The plan notes also that the appellant completed the psychological evaluation, and that the evaluation recommends ongoing support, that she must obtain a GED, and that she must obtain full-time employment with health benefits. The case plan comments that the psychological report states that the appellant is not able to find care for the children. The next statement is in parentheses and notes that reunification is not appropriate. Finally, the case plan states that the appellant has suitable housing for herself, but that the housing is not suitable for the children. On April 3, 2000, another amendment was filed to the case plan stating that the recommendations in the psychological report were added to reduce the risk of abuse or neglect to the children. The dates of the signatures on the amendment were February, 2000.
On August 18, 2000, another semi-annual review was conducted. This report was filed with the court on October 5, 2000. The report indicates that the appellant has not obtained her GED, had not enrolled in appropriate ongoing parenting classes, and was reportedly employed at a temporary job. As to housing, the report indicates that the appellant had a two-bedroom apartment, but that the social worker had never seen the housing because the appellant was evasive and never made herself available. The children all have significant behavior problems and are in counseling. The report also indicates that the appellant is developmentally low functioning and unable to grasp the significance of the risk and services. Under the other comments section of the report, it states that the appellant's barriers to progress and risk reduction for the children are the appellant's lack of motivation and low cognitive functioning. The report concludes that the children would still be unsafe if placed with the appellant. The report makes a notation that the appellant participates in visitation with the children, but that her social interaction is inappropriate.
In a letter dated November 8, 2000, the guardian ad litem (GAL) provided the court with his views. The GAL stated his belief that the children should not be returned to the appellant because she lives in a two-bedroom apartment that is much too small to accommodate the children. The GAL goes on to state that the main reason for denying reunification is that all of the children are special needs children and that:
 On average these children each have been in over three homes. These children are all in separate foster homes and have been removed due to their behavior. They all have learning disabilities and exhibit aggressive behavior. It is my opinion that neither of these parents could adequately parent any of these children let alone all of the children due to their special needs.
The GAL concluded that permanent custody should be granted to CCDCFS.
The trial court's final entry was journalized on December 13, 2000. The court found the allegations of the motion for permanent custody were met by clear and convincing evidence and found it in the best interest of the children to grant permanent custody to CCDCFS. Specifically, the court found the following which pertain to the appellant:
 a) The parents have failed to remedy the conditions that caused the removal of the children from the home.
 b) The parents have failed to successfully complete the case plan.
 c) Mother has failed to successfully complete a parent education program, as required by the case plan.
* * *
 f) Cuyahoga County Coroner's Office concluded that Tevin Raemil Jackson, a three-year-old sibling of the above children died of "Blunt impact to head, with brain and spinal cord injuries. VIOLENCE OF UNDETERMINE (SIC) ORIGIN." This child died in the home of the parents and to date, no explanation has been give (sic) as to how this child sustained his injuries.
A case plan dated December 28, 2000 was filed with the court on January 5, 2001. This case plan reflects that the current legal status of the children is permanent custody with CCDCFS.
At trial, CCDCFS presented as an exhibit the final report of the MetroHealth Parenting Program regarding the appellant. The report indicates that the appellant visits with her children, is attentive and loving, but "at times passive in managing their behavior." In summary, the report concludes that the appellant "listened attentively in group sessions and turned in thoughtful homework. However, she did not verbally participate much and her passivity may present ongoing difficulty in rearing a large family." The report states that the unresolved problem/issue remaining which may be significant in the appellant is passivity.
Trial court heard testimony regarding the motion for permanent custody of the six children on June 14, 2000, November 3, 2000, and November 7, 2000. The June 14, 2000, hearing began with the testimony of Laurie Sierra, a social worker and case manager for the Beacon Agency. Ms. Sierra was the case manager for the appellant's sixteen year-old child, Latoya, who is in a specialized foster care home supervised by the Beacon Agency. Ms. Sierra stated that Latoya had been diagnosed with dysthymia and oppositional defiance disorder and is medicated with both Ritalin and Wellbutrin. Latoya also has group mental health counseling, is learning disabled, and functions at the fourth or fifth grade level. Latoya can be verbally abusive, has been in physical fights, and has been suspended from school once. Although providing care for Latoya would be a challenge to any caretaker, Latoya's current foster mother has expressed an interest in adopting her. While many children in foster care at the age of sixteen are placed in independent living arrangements, Ms. Sierra testified that she was not sure that Latoya had the mental capacity to achieve independence.
Theresa Bogami is the social worker for CCDCFS assigned to the appellant's children. Ms. Bogami was assigned to the case in 1999, but is aware that the family history with CCDCFS dates back to 1985 for issues such as cleanliness and stability of housing, basic needs, supervision of the children, and educational neglect. The children were taken into custody May 27, 1997, due to the violent and unexplained death of a sibling and because the house was in deplorable condition. At the time of the hearing the children had been in the custody of CCDCFS for over three years.
Ms. Bogami described the current status of each of the children. In addition to the difficulties testified to by Ms. Sierra, Latoya has been deemed to be a sexual predator, has problems with hygiene and occassionally wets the bed, as a newborn/young infant had "failure to thrive" and missed her kindergarten year of school. Latoya has been in the same placement for two years, but she was in two previous placements. Latoya attempted suicide in August of 2000.
Alfred is thirteen years of age. He has been diagnosed as severely behaviorally handicapped and is learning disabled. During the November 3, 2000 hearing, Ms. Bogami testified that Alfred disrupted his specialized foster home placement and had been placed in a group home. He is approaching puberty, and because of his low functioning, he is not able to understand the changes he is undergoing. Due to his escalating behavior, the group home has requested his removal, and Ms. Bogami is currently seeking a residential placement.
Tyran, age twelve, receives counseling, is learning disabled, and is on medication. He has had two previous placements, has aggressive behaviors, and occasionally wets the bed, and although he is currently in a specialized foster home, the foster home has now requested his removal.
Rayshaun, age eleven, is in a specialized foster home, receives counseling, and is learning disabled. He also had been labeled failure to thrive as a young child. He had two foster care placements prior to his current placement. He now seems to be doing well.
Natasha, age ten, has been diagnosed with post traumatic stress disorder and has been placed in a residential placement due to her extreme behaviors. While in a foster home, Natasha was hurting small children, attempted to push a child down the stairs, and hurt the dog.
Sheila is nine years of age and is in counseling and is currently medicated with Ritalin. Sheila has had four foster care placements.
Ms. Bogami testified that the appellant attended and completed parenting classes. However, the appellant's completion was not considered successful because, based on the report from the program, the appellant was found to be well intentioned, but too passive and low functioning to manage the aggressiveness of her children. Ms. Bogami stated that the appellant's two-bedroom apartment is inadequate housing for the children. Although Ms. Bogami has attempted to see the appellant's housing conditions, the appellant was not present when she arrived. The appellant has attended grief counseling due to the death of her child. Ms. Bogami testified that as of July 1999, the appellant stopped attending the counseling sessions. The appellant did undergo a psychological examination performed by Dr. Anuszkiewicz. The report was submitted to the court and amendments were made to the case plan based upon the report. The report recommended that the appellant obtain full-time employment with health benefits, obtain a GED, and attend ongoing parenting classes. At the time of the hearing, the appellant had not attempted to fulfill any of those objectives. Ms. Bogami opined that permanent custody was in the best interest of the children. She described the appellant as well meaning, but low functioning, and stated that due to the number of children and their special needs, it would not be in the children's best interest to be returned home.
Ms. Bogami does not believe that the appellant comprehends the needs of the children. Given the special needs of all of the children, Ms. Bogami does not believe that any family, or any one parent could care for all of the children at one time. Ms. Bogami's testimony was clear that the appellant has not complied with the case plan. The appellant does not have adequate housing for the children, has not obtained a GED, and has not participated in ongoing parenting classes.
The appellant asserts four assignments of error.
The first assignment of error:
 THE TRIAL COURT ERRED BY GRANTING PERMANENT CUSTODY TO CCDCFS WHEN THE DECISION WAS NOT SUPPORTED BY THE EVIDENCE.
The appellant asserts that the trial court erred in finding by clear and convincing evidence that the appellant failed to remedy the housing conditions which caused the removal of her children. The appellant also argues that the trial court erred in finding that she failed to complete the case plan based on the failure to complete parenting classes.
R.C. 2151.414 enumerates the factors a trial court must consider when determining whether a child cannot or should not be placed with the parent. Specifically, the appellant cites to R.C. 2151.414(E)(1) and (4) which state:
 (E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 [2151.35.3] of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 [2151.35.3] of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
* * * *
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.
In the case sub judice, the trial court heard evidence that the appellant had failed to obtain sufficient housing for the children. While one of the causes for removal of the children may have been the deplorable conditions found in the home, it would be equally deplorable to consider a two-bedroom apartment sufficient housing for six behaviorally challenged children, none of whom are infants. This unwillingness to provide adequate housing not only shows that the appellant failed continuously and repeatedly to substantially remedy the conditions leading to the removal, it also demonstrates the appellant's lack of commitment to the children. The children were removed from the appellant's home in 1997. At the time of the end of the trial, November 7, 2000, the appellant had not remedied the substandard housing.
Additionally, we note that the appellant was required to obtain a GED, an objective towards which the appellant has not provided documentation that an attempt has even been made. Turning next to the sixteen-week parenting class attended by the appellant, the record demonstrates that the psychologist deemed this inadequate to ensure the long-term safety of the children. The case plan was amended to include ongoing parenting classes for the appellant. This requirement was not met and there is no evidence in the record that the appellant made any arrangements to begin such classes.
This court cannot find that the trial court erred in finding that the record demonstrates, by clear and convincing evidence, that the appellant failed to remedy the problems which led to the removal of her children.
The appellant's first assignment of error is overruled.
The second assignment of error:
 THE TRIAL COURT ERRED IN FINDING THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE CHILDREN.
The appellant asserts that the trial court erred in finding that permanent custody was in the best interest of the children. The appellant states that a strong bond exists between she and her children; that the children were "doing better" while in the custody of the appellant; that Latoya could still receive counseling if placed with the appellant; and that Latoya should be given a permanent planned living arrangement.
R.C. 2151.414(D) sets forth the factors the trial court must consider when determining a child's best interest:
 D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 [2151.35.3] or division (C) of section 2151.415
[2151.41.5] of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
We begin this analysis by noting that the trial court is statutorily required to consider all relevant factors when determining the best interest of the child. The trial court's finding that the children have special needs is amply demonstrated in the record and is not contested by the appellant. Under the circumstances of this case, it is clearly relevant, and vitally important, to consider those special needs of the children when determining their best interest. The trial court also noted that the children were in need of a legally secure placement and that this placement could not be achieved without a grant of permanent custody to CCDCFS. The appellant's six children have severe behavioral difficulties, need ongoing therapy, and some require prescribed medication. There is no indication in the record that any of the children's needs were being addressed prior to their placement in the temporary custody of CCDCFS. The court was wise to consider whether or not the appellant would be able to sustain children with such involved needs in a safe environment. Thus, the trial court did not err in failing to consider the best interest of all of the children when granting permanent custody to CCDCFS.
The appellant's second assignment of error is overruled.
The third assignment of error:
 THE TRIAL COURT ERRED BY ALLOWING INADMISSIBLE AND PREJUDICIAL HEARSAY DURING THE PERMANENT CUSTODY HEARING.
The appellant asserts that the trial court erred when it allowed the appellee to elicit testimony concerning the death of the appellant's three-year-old child. The appellant argues that this evidence was both inadmissible and prejudicial.
When resolving this issue, this court must consider both R.C. 313.10
and the evidentiary rules governing hearsay. In R.C. 313.10 the legislature has determined that:
 The records of the coroner, made by himself or by anyone acting under his direction or supervision are public records, and such records, or transcripts, or photostatic copies thereof, certified by the coroner, shall be received as evidence in any criminal or civil court in this state, as to the facts contained in such records.
Evid.R. 802 provides the general rule that hearsay is not admissible. Evid.R. 803 provides certain exception to the general rule. In this instance, the appellee has asserted that Evid.R. 803(8) provides an exception to the hearsay rule and renders the corner's report admissible. Evid.R. 803(8) states:
 (8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, unless offered by defendant, unless the sources of information or other circumstances indicate lack of trustworthiness.
In Perez v. Cleveland (1997), 78 Ohio St.3d 376, citing to Vargo v.Travers Ins. Co. (1987), 34 Ohio St.3d 27, the Ohio Supreme Court noted the presumptive value to be accorded a coroner's verdict. In Vargo,supra, the court held at syllabus one that the coroner's factual determinations concerning the manner, mode and cause of death, as expressed in the coroner's report and the death certificate, create a nonbinding rebuttable presumption concerning such facts in the absence of competent, credible evidence to the contrary. (R.C. 313.19, construed.) At syllabus two, the court held that R.C. 313.19 does not deprive a civil litigant of due process of law. The statute does not compel the fact-finder to accept, as a matter of law, the coroner's factual findings concerning the manner, mode and cause of decedent's death. In the body of the Vargo opinion, the Supreme Court recognized the quasi-judicial character of the coroner's statutorily mandated duty to ascertain, in certain cases, a person's cause of death. Courts have found coroners's reports to be admissible. See State v. Jacks (1989), 63 Ohio App.3d 200;Goldsby v. Gerber (1987), 31 Ohio App.3d 268; and In re Knipp (March 28, 1983), Scioto App. No. 1388, unreported.
In the matter at hand, the trial court accepted into evidence an authenticated coroner's report which reviewed the death of the appellant's son. Pursuant to the language used in R.C. 313.10 and Evid.R. 803(8), and the case law, we find the admission of the coroner's report was proper.
The next question is whether or not the admission of the report was prejudicial. This court finds that it was not. The coroner's report and the death of the appellant's son was only one of four reasons listed by the trial court justifying the removal of the appellant's children to the permanent custody of CCDCFS. Thus, even absent any mention of the death of the appellant's son, the record demonstrates by clear and convincing evidence that the grant of permanent custody to CCDCFS was proper. No prejudice accrued to the appellant by the introduction of this evidence.
The appellant's third assignment of error is overruled.
The fourth assignment of error:
 THE COURT ERRED BY UTILIZING A CASE PLAN DURING THE PERMANENT CUSTODY THAT CCDCFS FAILED TO FILE WITHIN THE STATUTORY TIME LIMIT AS REQUIRED BY OHIO REVISED CODE SECTIONS 2151.353(D) AND 2151.412.
The appellant asserts the case plan upon which CCDCFS premised its case was not timely filed in accordance with the requirements of R.C. 2151.353(D) and R.C. 2151.412. The appellant argues that this failure impacted CCDCFS's ability to present its case to the trial court.
R.C. 2151.353(D) states that as part of its dispositional order, the court shall journalize a case plan for the child. The journalized case plan shall not be changed except as provided in section R.C. 2151.412.
R.C. 2151.412 states in pertinent part that:
 (A) Each public children services agency and private child placing agency shall prepare and maintain a case plan for any child to whom the agency is providing services and to whom any of the following applies:
 (1) The agency filed a complaint pursuant to section 2151.27 of the Revised Code alleging that the child is an abused, neglected, or dependent child;
 (2) The agency has temporary or permanent custody of the child;
 (3) The child is living at home subject to an order for protective supervision;
 (4) The child is in a planned permanent living arrangement. * * *
 (C) Each public children services agency and private child placing agency that is required by division (A) of this section to maintain a case plan shall file the case plan with the court prior to the child's adjudicatory hearing but no later than thirty days after the earlier of the date on which the complaint in the case was filed or the child was first placed into shelter care. If the agency does not have sufficient information prior to the adjudicatory hearing to complete any part of the case plan, the agency shall specify in the case plan the additional information necessary to complete each part of the case plan and the steps that will be taken to obtain that information. All parts of the case plan shall be completed by the earlier of thirty days after the adjudicatory hearing or the date of the dispositional hearing for the child.
 (D) Any agency that is required by division (A) of this section to prepare a case plan shall attempt to obtain an agreement among all parties, including, but not limited to, the parents, guardian, or custodian of the child and the guardian ad litem of the child regarding the content of the case plan. If all parties agree to the content of the case plan and the court approves it, the court shall journalize it as part of its dispositional order. If the agency cannot obtain an agreement upon the contents of the case plan or the court does not approve it, the parties shall present evidence on the contents of the case plan at the dispositional hearing. The court, based upon the evidence presented at the dispositional hearing and the best interest of the child, shall determine the contents of the case plan and journalize it as part of the dispositional order for the child.
In In re Milella (June 29, 2001), Ross App. No. 01CA2593, unreported, the plaintiff argued that the original case plan with its reunification goal was still the only legally effective case plan. The court held that even though the case plan was improperly amended, the trial court retained jurisdiction under R.C. 2151.23 to determine the disposition of the children. The court also noted that "nowhere in the Ohio Revised Code, nor in Ohio case law, have we found support for appellant's proposition that there must be a case plan in place with the specific goal of adoption before a party may request that a child be placed in the permanent custody of a children services agency."
As noted in the facts supra, the record reveals that in the case now before this court, CCDCFS filed a case plan with the trial court on July 28, 1997. The complaint for temporary custody was filed on August 1, 1997 and signed in October 1997. The motion for permanent custody was filed on April 28, 1998. An amendment to the case plan regarding services to the appellant was filed on April 3, 2000. The permanent custody hearing was held on June 14, 2000; November 3, 2000; and November 7, 2000. The judgment entry granting CCDCFS was journalized on December 13, 2000. The final case plan was subsequently filed with the trial court.
It is clear that the legislature intended that departments of children and family services provide a case plan and that the case plan be journalized by the trial court. However, this court also notes that R.C.2151.414(A)(1) provides that the adjudication that the child is an abused, neglected, or dependent child and any dispositional order that has been issued in the case under section R.C. 2151.353 pursuant to the adjudication shall not be readjudicated at the permanent custody hearing. As noted in the facts supra, at a hearing before the trial court held on September 18, 1997, the appellant admitted to the complaint, as amended, and the court committed the children to the temporary custody of CCDCFS.
The record presents no evidence that at the time of the adjudicatory hearing, or at any time prior to the present appeal, that the appellant objected to the case plan or to its timeliness. The trial court retained jurisdiction to enter the dispositional order placing the children in the permanent custody of CCDCFS.
The appellant's fourth assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court, Juvenile Division to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
TIMOTHY E. McMONAGLE, A.J., and PATRICIA A. BLACKMON, J., CONCUR.
[1] The father of all of the appellant's children is Alfred Jackson. Because he has not appealed the trial court's decision, this opinion does not address issues relating to Mr. Jackson.
[2] This order was not journalized until April 16, 1998.
[3] The amended complaint could not be located in the file.
[4] A case plan time stamped April 26, 1999 is attached to the six-month review conducted by CCDCFS. The six-month review has a time-stamp dated February 17, 2000.